LAW OFFICES OF KYLE KUBISCH
Kyle Kubisch (State Bar No. 203981)
2600 Michelson Drive, Suite 1700
Irvine, CA 92612
Telephone: 949-225-4475
Facsimile: 949-225-4476
kkubisch@kubischlaw.com

Attorneys for Plaintiff
SHUTAO LIN

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHUTAO LIN,<br><br>          Plaintiff,<br><br>     v.<br><br>THE GABONESE REPUBLIC,<br><br>          Defendant. | Case No.  8:19-cv-01677-JVS-KES<br><br>**DECLARATION OF SHUTAO LIN IN SUPPORT PLAINTIFF SHUTAO LIN'S MOTION FOR DEFAULT JUDGMENT AGAINST DEFENDANT THE GABONESE REPUBLIC**<br><br>**Date:   March 23, 2020**<br>**Time:  1:30 p.m.**<br>**Dept:  10C** |

I, Shutao Lin, declare as follows:

1.      I am the Chief Executive Officer and President of Morning Star International Corporation ("MSI"). MSI is a family-owned business and all equity interest is held by myself and my children. Until February 21, 2020, I represented myself in this action. I am the assignee of claims held by MSI against the Defendant The Gabonese Republic ("Defendant").

2.      I have several decades of experience in the scrap metal trading business. I have directed and managed operations that collected, removed, traded and sold scrap metal throughout the world, including Brazil, China, Hong Kong, Indonesia, South Africa, South Korea, Turkey and various Eastern European and Middle Eastern countries.

3.      In July 1994, following substantial discussion with representatives of the Defendant, I was invited by Defendant's Minister of Transport, Tourism and National Parks to come to Gabon to negotiate the sale of 3000,000 metric tons of scrap metal from Gabonese railways. Over the course of several weeks, I met a number of high-ranking Gabonese government officials to negotiate the agreement and inspected and researched the project. The project was enthusiastically encouraged by the United States government.

4.      Based upon my inspections, research and information provided by Defendant, I determined that of the 300,000 metric tons of scrap metal Defendant offered, such was comprised of approximately 20,000 metric tons of new rail, 10,000 metric tons of used rail, 20,000 metric tons of wheel and axle sets, and 250,000 metric tons of other track material. Much of this material was composed of high-quality steel.

5.      The 20,000 metric tons of new rail were in 25-meter lengths of 50 kilograms per metre weight. There were rails of different lengths at different sites along the railway lines, and there also were approximately 5,000 large drums containing new, unused link plates, metal bars, bogies and other track equipment. There also were approximately 5,000 to 6,000 metric tons of new wheels and axles, each item weighing several tons. These items were high-quality, and I discovered that they had been produced in western Europe.

6.      On February 2, 1994, MSI and a Hong Kong buyer, Mountain Shine Limited, entered into a contract for the delivery of 300,000 metric tons of new steel rails from Poland, with specifications similar to the Gabon rail, that is 50 kilograms per metre in 25-metre lengths. The agreed price was $265.00 per metric ton, CIF Chinese ports. This price is indicative of what might I believe the 20,000 metric tons of new rail would have sold for in 1995 and 1996.

7.      During my on-site inspections, I noted there were between 12 and 15 railways locomotives manufactured by the American firm General Electric, and more

DECLARATION OF SHUTAO LIN IN SUPPORT OF MOTION FOR DEFAULT JUDGMENT AGAINST DEFENDANT THE GABONESE REPUBLIC

than double that number of locomotives manufactured in European Union countries. Although these locomotives were not operational, they could have been refurbished. There were also approximately 35 freight trains and passenger trains which were suitable for repair and re-commissioning.

8.    It was my estimation that approximately 25% to 30% of the scrap metal was new and that another 35% to 40% was in good condition and suitable for further use. The balance of the metal, amounting to approximately one-third of the total tonnage, was scrap of which the bulk, which I estimated at 70%, consisted of No. 1 Heavy Melting Steel ("HMS"). Most of the rest of the scrap was No 2 HMS.

9.    On August 23, 1994, Defendant provided MSI the exclusive right to collect 300,000 tons of scrap metal from the Gabonese railways for $20 for each metric ton pursuant to a written contract (the "Agreement"). The Agreement was signed in a televised contract-signing ceremony that included a host of Gabonese public officials and officials from the United States Embassy. The scrap metal was defined to mean the total amount of scrap metal, railcar wheels, axles, and other surplus railway equipment when no longer usable for the Trans-Gabon Railway and was of various steel grades. A copy of the Agreement is attached as Exhibit "3" to the operative Complaint.

10.    The primary costs of conducting the scrap-metal recovery operation pursuant to the Agreement included the price per ton payable to Defendant, the expense of gathering the scrap at various locations, the transportation of the scrap metal and off-loading at the port of Owendo, sea freight from Owendo to buyers abroad including vessel loading costs and insurance, overhead costs incurred in managing the endeavor including financial charges for letters of credit, and payment of a purchase price per ton. The Agreement called for $20.00 per metric ton of scrap metal payable by MSI.

11.    The stevedoring charges at Owendo port in 1994/1995 were approximately $7.50 per metric ton. Although Owendo was a comparatively small

DECLARATION OF SHUTAO LIN IN SUPPORT OF MOTION FOR DEFAULT JUDGMENT AGAINST DEFENDANT THE GABONESE REPUBLIC

port at that time, it served as a loading port for bulk materials that were exported from Gabon. There were three active berths and wage rates in Owendo at the time were very low.

12. Sea freight costs between Owendo and the Far East, where I had market opportunities in 1994/1995, was determined by the size of the vessel which in turn is influenced by the stowage factor of the scrap metal on board the ship, water depth, physical characteristics of the port of Owendo, and the loading rates. I anticipated utilizing vessels hired for scrap transport with their own cranes and loading equipment in order to allow more rapid loading and thereby reduce the overall costs.

13. The management costs of the work required in the Agreement in 1994/1995 were expected to be $3.91 per metric ton. I estimate that financial costs including bank charges for letters of credit were about 1% in 1994/1995. I estimate that the total management costs would have been $5.50 per metric ton.

14. On or about November 2, 1994, I, along with approximately thirteen MSI employees, arrived in Gabon with equipment and materials to prepare for performance. I met with Alexandre Ayo Barro, the President-Director in regard to the project, who provided permission to commence work. Work began on or about November 19, 1994.

15. I was summoned by the son-in-law of the Gabonese President to meet with General Neree Fernand Odjia, Commander of the Gabonese Presidential Guard. Genera Odjia demanded that I pay him $10 million. I refused to pay. Of note, upon arriving in Gabon, I was expressly advised by the U.S. Embassy that it was illegal to pay bribes to any government official.

16. After I refused to pay General Odjia, MSI's employees were trailed and harassed by the Defendant's Presidential Guard. I was personally subjected to further extortion demands from other Gabonese government officials. This included:

- a $5 million demand from Defendant's incoming Minister of Transportation

DECLARATION OF SHUTAO LIN IN SUPPORT OF MOTION FOR DEFAULT JUDGMENT AGAINST DEFENDANT THE GABONESE REPUBLIC

- a $3 million demand by a Director-General
- a $500,000 demand by the Secretary-General of Transportation
- A $50,000 demand by the Defendant's President's physician.

17.    I considered these demands to be highly improper and violative of American and international law such as the Foreign Corrupt Practices Act of 1977. Hence, I refused to pay.

18.    After I made my position clear, General Odjia threatened that unless I paid him $10 million, that my employees would be harassed, the work would stop, and that I would be ejected from the country. In the following weeks, both I and MSI employees were harassed by Gabonese police officers and members of the President's security detail.

19.    By way of a letter dated December 2, 1994, Defendant purported to terminate the Agreement. Defendant did so on the pretext that MSI had not started its operations and had failed to provide a bank guarantee. These claims were without merit as work had timely commenced and there was no obligation under the Agreement to issue a bank guarantee.

20.    Shortly thereafter, I discovered that Defendant had entered into an agreement with a company owned by one of the ex-wives of Omar Bongo, who was the Gabonese president at the time, to obtain and sell the same scrap metal was the subject of the Agreement. I believe this violated the exclusive right granted to MSI to collect the scrap metal under the Agreement.

21.    Even after Defendant's termination letter, General Odjia continued to demand money from me. In mid-December 1994, General Odjia reduced his $10 million demand to $600,000 and indicated that he could get the project going on if I paid him that amount. After I refused, General Odjia pointed his pistol at me and threatened my life in the Gabon presidential palace.

22.    Defendant then attached MSI's bank account in Gabon and seized its property.  For employee safety, I sent nearly all of them home. The U.S. Ambassador

DECLARATION OF SHUTAO LIN IN SUPPORT OF MOTION FOR DEFAULT JUDGMENT AGAINST
DEFENDANT THE GABONESE REPUBLIC

to Gabon, Joseph C. Wilson, asked that I stay and advised that he would speak directly with President Bongo. After resolution failed, I sought to leave Gabon. However, on February 14, 1995, I was retained at Libreville Airport and my passport was seized. After the US ambassador intervened, I was released four days later. Defendant never returned the equipment at the time of conversion.

23.   Defendant took possession of **$103,122** in property consisting of:

| Description of Items(s) | Cost in US Dollars |
|---|---|
| Tools | $50,122.00 |
| Fuel | $8,000.00 |
| Steel Strapping etc. | $24,000.00 |
| Inland Operations | $21,000.00 |
| Total | $103,122.00 |

24.   In addition, at least **$630,000.00** was expended in preparing for performance.

| Description of Items(s) | Cost in US Dollars |
|---|---|
| House Staffs (Cooks, Maids, Security) | $17,051.00 |
| Local Manager and Translator | $20,338.00 |
| Food | $18,122.00 |
| Restaurants in Gabon | $5,122.00 |
| Utilities in Gabon | $4,500.00 |
| Household Supplies in Gabon | $9,691.00 |
| Truck and Van Rental | $5,250.00 |
| Housing for US Employees | $15,000.00 |
| Corporate Registration in Gabon | $2,000.00 |
| Carte de Sassure for US Employees | $13,000.00 |
| Two Boom Crane Rental @ 350/per day | $7,000.00 |
| *Establishment  an Institute for Gabon's | $101,250.00 |

6

Sustainable Development (Tufts)

| | |
|---|---|
| Hotel Lodging in Gabon | $2,500.00 |
| Airlines | $48,181.00 |
| Consultant Fees | $20,300.00 |
| Letter of Credit and Banking Charges | $28,578.00 |
| Mobilization for US Employees | $34,278.00 |
| US Employees Payroll | $277,839.00 |
| Total | $630,000.00 |

25.    In the interim, I received considerable support from many members of Congress related to what has transpired. Among other things, a bipartisan group of house members and senators intervened on my behalf and sought to promote resolution. Attached hereto as **Exhibit "1"** is a true and correct copy of a 1998 sent to President Bongo by two United States senators and three members of the House of Representatives.

26    After failed resolution efforts, MSI initiated proceedings in the Amsterdam District Court, Netherlands. Defendant did not respond, and a default judgment was entered against it in the principal sum of $25,433,122 (plus pre and post judgment interest and costs) on December 14, 2005. That judgment awarded the following amounts:

- $24,700,000 in economic damages increased at the statutory interest rate from December 2, 1994 through satisfaction
- $630,000 from December 2, 1994 through satisfaction
- $103,122 from February 16, 1995 through satisfaction

A translated copy of the December 14, 2005 judgment is attached hereto as **Exhibit "2"**.

27.    I obtained an expert opinion from William George Prast, an American educated Chartered Engineer (CEng) in the United Kingdom who was registered as a European Engineer with the European Federation of National Engineering

Associations in regard to establishing damages in the Amsterdam District Court.  Mr. Prast opined that economic damages in the sum of $24,700,000 was incurred as result of Defendant's breach. It is my understanding that the Amsterdam District Court relied upon Mr. Prast's report as it awarded exactly that amount in economic damages in its December 14, 2005 judgment. A copy of Mr. Prast's report is attached hereto as **Exhibit "3"**.

28.     In 2009, Defendant sought to have the December 14, 2005 judgment set aside. That effort was unsuccessful. After several additional legal battles related to efforts to levy upon Defendant's assets based in the Netherlands, the Netherlands Court ruled on September 5, 2014 that it could not be established that Defendant was the beneficiary of the assets sought to be attached which apparently mooted the December 14, 2005 judgment MSI obtained.

29.     On or about November 2015, MSI levied 27 prejudgment third party attachments against Defendant. In a February 29, 2016 interlocutory ruling, the Amsterdam District Court, in agreement with MSI, asked a number of prejudicial questions on immunity of execution to the Dutch Supreme Court. On September 30, 2016 the Dutch Supreme Court ruled that the burden of proof regarding the absence of any public purpose of the attached goods rests on the creditor and not on the foreign state and that the creditor would be unable possible to retrieve the destination of goods owned or receivables owed to a foreign state. A copy of this translated ruling is attached hereto as **Exhibit "4"**.

30.     I am aware of two recent actions filed against Defendant in which it failed to respond to actions filed in the United States District Court and had default judgments entered against it—*Bryan Cave Leighton Paisner LLP v. The Gabonese Republic* Case No. 1:19-cv-1577 and *CKK and Enka İnşaat Ve Sanayi A.Ş. v. The Gabonese Republic* Case No. 1:18-cv-02458-CKK.  Attached hereto as **Exhibit 5** and **Exhibit 6** are true and correct copies of the court dockets in regard to these two matters. The dockets were obtained through Pacer.

DECLARATION OF SHUTAO LIN IN SUPPORT OF MOTION FOR DEFAULT JUDGMENT AGAINST DEFENDANT THE GABONESE REPUBLIC

31.    In compliance with Local Rule 55-1:

- Defendant's default was entered on January 7, 2020 in regard to the operative complaint that was filed on September 3, 2019
- Defendant is not an infant, incompetent person, member of the military service or otherwise exempt from default judgment under the Service Members Civil Relief Act, 50 App. U.S.C. § 521
- Notice of this Motion is not required to be served on Defendant pursuant to F.R.Civ.P. 55(b)(2).

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on this 24th day of February 2020 in Irvine, California.

_____/s/  Shutao Lin_____

Shutao Lin

DECLARATION OF SHUTAO LIN IN SUPPORT OF MOTION FOR DEFAULT JUDGMENT AGAINST DEFENDANT THE GABONESE REPUBLIC

1    I hereby attest that I have in my possession the original executed declaration

2  provided by Shutao Lin.

3

4                                                           _/s/  Kyle Kubisch_

5                                                          Kyle Kubisch

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF SHUTAO LIN IN SUPPORT OF MOTION FOR DEFAULT JUDGMENT AGAINST
DEFENDANT THE GABONESE REPUBLIC