OCTRA                                                                          TRANSLATION

## AGREEMENT REGARDING
## THE SALE OF SCRAP METAL

BETWEEN

L'OFFICE DU CHEMIN DE FER TRANSGABONAIS
REPRESENTED BY ITS GENERAL MANAGER
MR. CELESTIN NDOLIA-NHAUD
B.P. 2198
LIBREVILLE
GABON
HEREAFTER REFERRED TO AS "OCTRA"

                                                                    ON THE ONE HAND,

AND

MORNING INTERNATIONAL CORPORATION
REPRESENTED BY ITS PRESIDENT
MR. SHUTA LIN
9 LANE
WESTPORT, CONNECTICUT  06880
USA
HEREAFTER REFERRED TO AS THE "PURCHASER"

                                                                    ON THE OTHER HAND,

THE PARTIES HEREBY AGREE AS FOLLOWS:

### ARTICLE 1 - PURPOSE

The purpose of this Agreement is the sale to the Purchaser who so requested, of the scrap metal originating from the workshops and various yards of the Transgabonais Railway.

### ARTICLE 2 - DEFINITION OF TERMS

The parties understand "scrap metal" to mean the total amount of scrap metal of OCTRA, the wheels, the axles and other railway equipment rendered useless for the operation [of the railway].

The Purchaser designates Morning Star International Corporation; the Seller designates OCTRA.

2

## ARTICLE 3 - EXCLUSIVITY

An exclusivity in terms of geographical scope and duration is granted to the Purchaser.

This exclusivity in geographical scope extends from the zone of Owendo, inclusive, to the station at Lastouville, exclusive, and is limited in duration to 24 months.

By signing this Agreement within the limits set forth in Article 1 hereof, during the life of this Agreement, OCTRA shall not conduct any inspection, negotiation and shall not accept any sale originating from persons other than the Purchaser.

In case of violation of this provision, the Purchaser shall have the right to claim damages in accordance with the arbitration clause.

Within the same limits, OCTRA agrees to prohibit or prevent any transaction involving the scrap metal that would be undertaken by its employees.

This provision applies equally to employees or associates of the Purchaser.

## ARTICLE 4 - QUANTITY

The volume of scrap metal to be sold is estimated at approximately 300,000 metric tons.

## ARTICLE 5 - CONTROL OF THE SCRAP METAL

The Purchaser, prior to any salvage on site, must conform to the scrap metal designated in the different minutes of OCTRA, which will be assembled as soon as the work begins.

Each salvage will be the subject of a report signed by both parties.

## ARTICLE 6 - PACKAGING

OCTRA grants all powers to the Purchaser to use the packaging of its choice, either for transport by waterway or by railway, except that the dimensions imposed by the rules concerning railway transportation must be respected.

## ARTICLE 7 - PRICE

The global price of the Agreement is set at Six Million Dollars ($6,000,000), calculated at twenty dollars ($20) per metric ton.

For purposes of this Agreement, the price will not include the price of transportation, from the salvage site to the Port of Owendo, delivered ex quay of embarkment, and the export tax.

It is agreed that all of these charges are the responsibility of the Purchaser.

## ARTICLE 8 - INSPECTION

The Purchaser, its representatives and workers will be authorized by OCTRA to conduct inspections on the various sites, and to operate freely on the site, under the control of OCTRA and during normal business hours.

## ARTICLE 9 - WEIGHING

Prior to each shipping, all salvage will be weighed in the presence of representatives of both parties by the scale located in the sorting station.

The report of the weighing will be signed and shall be used for billing purposes.

## ARTICLE 10 - LOADING

The loading of the scrap metal will take place at the Port of Owendo in the presence of representatives of both parties. The transport by rail, however, will be subject to the terms contained in the security rules of OCTRA.

The delivery will take place at the Port of Owendo, delivered ex quay.

## ARTICLE 11 - EXPORT CHARGES AND EXPENSES

The port charges, customs duties and other export taxes are the responsibility of the Purchaser.

The Purchaser has the right to import by ship logistical equipment (vehicles, spare parts, etc.) under the transit conditions in effect in Gabon.

4

## ARTICLE 12 - TERMS AND CONDITIONS OF PAYMENT

The payment will be made by irrevocable letter of credit and confirmed by the bank of New York domiciled in the United States at:

101 Barclay Street
New York, NY 10286
Attn: L/C Dept. 8E

Telex: 232241, 420268, 62832, 02763, 177363, 177612

Cable: Bankone, New York SWFT: IRVTUS3N ASSET: USIBC

on the basis of the documents evidencing the quantity and speed of the loading.

[Payment] will be made within three full business days following the embarkment, at the account opened in the name of Office du Chemin de Fer Transgabonais, No. 9070003420/30, opened with:

Banque Internationale pour le Commerce et l'Industrie du Gabon (BICIG)
Avenue du Colonel Parant
B.P. 2241
Libreville, Gabon

Telex: 5226 GO

Fax: 74-40-34

## ARTICLE 13 - PORT OF DELIVERY

OCTRA will take all necessary steps to facilitate the contacts and transactions with the port authorities and those in charge of lighterage.

## ARTICLE 14 - FACILITIES

If an export license is required, it is the responsibility of the Purchaser.

OCTRA will guarantee to the Purchaser access to and free movement within the sites.

OCTRA will grant to the Purchaser traffic facilities by train and, as the case may be, will make a vehicle available at the inspection sites, and such services will be billed [to the Purchaser].

Case 8:19-cv-01677-JVS-KES Document 33-2 Filed 07/06/20 Page 5 of 7 Page ID #:404
APR 2'96 17:05 FR                                                              TO 912127599133         P.06

5

ARTICLE 15 - FORCE MAJEURE

The Agreement is subject to rules concerning acts of force majeure. If at any moment during the course of its period of validity either party is no longer able to fulfill its obligations for certain causes, notably: military operations of any nature, hostile public acts, strikes, sabotage, fires, explosions or cataclysms of any kind affecting factory production, handling, loading or unloading facilities, epidemics, quarantine, war (current or imminent), natural disasters, government or official acts, then, in these cases, both parties shall reach a consensus to cancel, suspend or postpone the performance of the work, all without prejudice or harm for either party.

The party that invokes the force majeure must provide proof thereof by any means.

ARTICLE 16 - RESOLVING LITIGATION OR DISPUTES

This Agreement is governed by Gabonese Law.

Any disputes and/or claims arising in connection with the performance and/or interpretation of this Agreement will be settled amicably by both parties.

As the case may be, the parties agree to turn to the Paris International Chamber of Commerce.

If the parties fail to agree amicably or by way of conciliation, any disputes will be decided definitively in accordance with the Rules of Conciliation and Arbitration of the Chamber, by two arbitrators named in accordance with these Rules.

The arbitration will take place in Paris in accordance with these Rules.

The costs will be borne by the losing party.

ARTICLE 17 - INSURANCE AND PROTECTION OF THE YARDS

The Purchaser must take full responsibility for all measures of order and of police necessary to maintain public traffic around the salvage yard, at embarkment and unloading.

The Purchaser is responsible for the salvage work and must ensure that the work is performed in good order. It must take out an insurance policy with an approved company against all risks, namely, accidents and other damages that may occur to people who would have been hired to perform this work, including all damage

6

caused to the installations and equipment of the Office. In this matter, any recourse against OCTRA is forbidden.

### ARTICLE 18 - VALIDITY AND DURATION

This Agreement, which shall become effective upon its execution, is valid for a duration of 24 months.

The Purchaser will do everything in its power to ensure that the operation takes place continually until the end of its completion.

The Purchaser has three months from the signature date to begin the work.

### ARTICLE 19 - TERMINATION

This Agreement may be terminated at any time by either party for breach of the contractual obligations. The party that initiates the termination must inform the other party by registered letter, return receipt requested, one (1) month prior to the termination date.

### ARTICLE 20 - LANGUAGE

The language of the Agreement is French. Any interpretation or any proceeding relating thereto will be conducted in French.

### ARTICLE 21 - FINAL PROVISIONS

This Agreement is made in six copies.

The registration duties and the costs related thereto are to be borne by the Purchaser.

Libreville, this ____ day of _____, 19__.

For OCTRA                                         For MORNING STAR
                                                  INTERNATIONAL CORPORATION

[Signature]                                       [Signature]
Michel Deltour                                    Shuta Lin
Controller                                        President

[Stamp and signature of the General Manager of
Office du Chemin de Fer Transgabonais]
Celestin Ndolia-Nhaud
General Manager


THE CHAIRMAN OF THE BOARD OF DIRECTORS

[Stamp and signature of the Chairman of the Board
of Directors of Office du Chemin de Fer Transgabonais]
Alexandre Ayo Barro


THE MINISTER OF TRANSPORTATION, TOURISM
AND NATIONAL PARKS

[Stamp and signature of the Minister of
Transportation, Tourism and National Parks]
Martin-Fidele Magnaga